UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID W. GREGOIRE,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT; COUNTY OF SACRAMENTO; SHERIFF SCOTT JONES, in his official capacity only; DEPUTY ANTHONY JENKINS in his individual capacity<br><br>　　　　Defendants. | No.  2:13-cv-01857-TLN-DAD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

　　　　This matter is before the Court pursuant to Defendants Sacramento County, County of Sacramento Sheriff's Department, and Sacramento County Sheriff Scott Jones (collectively referred to as "County Defendants"), as well as Deputy Sheriff Anthony Jenkins' ("Jenkins") (all Defendants collectively referred to as "Defendants") Motion for Summary Judgment.  (ECF No. 42.)  Plaintiff David Gregoire ("Plaintiff") opposes Defendants' motion.[1]  (ECF No. 52.)  Defendants have filed a reply.  (ECF No. 53.)  The Court has carefully considered the arguments

---

[1]　　Plaintiff has filed a request for judicial notice for three declarations filed in a different lawsuit *Gangstee v. Cnty. Of Sacramento Sheriff's Dept.*, Case No. 2:10-cv-100-KJM-GGH, pursuant to Federal Rule of Civil Procedure 201.  (ECF No. 48.)  Defendants have not opposed Plaintiff's request.  These declarations are court documents. Thus, they can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Accordingly, Plaintiff's request (ECF No. 48) is granted.

1

raised in the parties' briefing. For the reasons set forth below Defendants' Motion for Summary Judgment (ECF No. 42) is **GRANTED IN PART** and **DENIED IN PART**.

### I. FACTUAL BACKGROUND

This litigation stems from an incident in which an innocent bystander was bit by a canine officer during an arrest. The Court has derived the following account of the incident from the statements of undisputed facts submitted by the parties.

Jenkins is a twenty-year veteran of the Sacramento County Sheriff's Department, and has been a canine handler for the department for the past 13 years. (Statement of Undisputed Facts ("SDF"), ECF No. 51 at ¶ 1.) On September 9, 2012, Deputy Jenkins was on duty with his canine partner Eko when he received a radio call from Sacramento County Sheriff's Deputy Jason Harris ("Harris"). (SDF at ¶ 2.) Harris told Jenkins that he took a domestic violence report from the girlfriend of one Michael Fifield, a convicted felon on parole (hereinafter the "Suspect"). (SDF at ¶ 3.) Harris asked Jenkins to help him and Deputy Formoli locate and arrest the Suspect for several domestic violence related felonies, including felony spousal abuse, assault with intent to commit great bodily injury or death, false imprisonment, and making terrorist threats. (SDF at ¶ 4.) Harris told Jenkins that the girlfriend said she owned two guns – a shotgun and a pistol – and that both guns were within the home that the victim shared with the Suspect on Darien Circle in Sacramento County. (SDF at ¶ 5.) The girlfriend mentioned to Harris that the Suspect "would shoot it out with the police if he got to the home where the guns were located." (SDF at ¶ 6.) Harris informed Jenkins that the girlfriend had told him that the Suspect was likely to "shoot it out" with police to avoid being arrested. (SDF at ¶ 6.)

Jenkins met Harris and Deputy Formoli near the house where the Suspect lived. (SDF at ¶ 7.) They were all driving marked patrol cars (SDF at ¶ 8), and Jenkins's car had a video camera mounted on the dashboard to record events as they happened (SDF at ¶ 9). The deputies met at around 10:15 a.m. (SDF at ¶ 10.) For safety reasons, Deputy Harris had the girlfriend call the Suspect and tell the Suspect to pick her up from work so that the deputies could apprehend the Suspect outside of the house. (SDF at ¶ 10.) Their goal was to wait until the Suspect left his house to effect his arrest in order to reduce the risk of having a shootout with the police. (SDF at

1  ¶ 11.) Jenkins had his video camera on and recording when a car belonging to the girlfried—a
2  white Mitsubishi Lancer—rolled up to the stop sign near where the deputies were parked and
3  turned right. (SDF at ¶ 12.) Deputy Harris determined the Suspect was driving the car, and the
4  deputies initiated a felony traffic stop. (SDF at ¶ 13). The deputies state that they did not know
5  whether the Suspect had a shotgun, pistol, or any other weapon in the car. However, Plaintiff
6  disputes this fact and alleges that the deputies had no evidence of the Suspect being armed. (SDF
7  at ¶ 14.)

8       The Suspect refused to stop, and the deputies began following the Suspect with their
9  emergency lights and sirens on. (SDF at 15.) At times the Suspect drove very slow, and at other
10 times he drove at a high speed for the conditions—50 mph or more—as he led the deputies on a
11 chase through several residential areas. (SDF at 16.) The Suspect violated several traffic safety
12 regulations during the chase, like running stop signs, speeding, making unsafe turns, crossing the
13 center line, and general reckless driving. (SDF at ¶ 17.)

14      When the Suspect neared the red light at Elk Grove Florin Road, he braked and made a
15 dangerous, wide right turn onto Elk Grove Florin Road against the red light and into the path of
16 oncoming traffic. (SDF at ¶ 18.) After he turned right onto Elk Grove Florin Road, the Suspect
17 sped up, and from the route the Suspect was driving, it seemed to Jenkins like the Suspect might
18 be trying to circle back to his house on Darien Circle. (SDF at ¶ 19.) Jenkins did not want the
19 Suspect to return to his house in the event that the shotgun and pistol were still inside. (SDF at ¶
20 20.) The Suspect was traveling at high speeds down Elk Grove Florin Road when suddenly, and
21 without warning, he braked quickly and made a reckless right at the next traffic light just as the
22 traffic light turned green. (SDF at ¶ 21.) The Suspect then sped up and braked quickly again and,
23 as feared, turned right onto Darien Circle toward his home. (SDF at ¶ 22.)

24      Once the Suspect turned onto Darien Circle, Harris was able to stop the
25 Suspect's car with a tactical pursuit intervention technique (PIT). (SDF at ¶ 23.) Harris's patrol
26 car traveled past the Suspect's car when Deputy Harris completed the PIT of the Suspect's car
27 (SDF at ¶ 25), and Jenkins stopped with the front end of his patrol car somewhere between seven
28 and fifteen feet from the driver's door of the Suspect's car. (SDF at ¶ 26.) All of the deputies in

1   the chase stopped their patrol cars near the Suspect's car, exited their patrol cars, drew their
2   weapons, and began ordering the Suspect to "get your hands up." (SDF at ¶ 24.) Before the
3   Suspect exited the car, the deputies had established a cover position. (SDF at ¶ 28.)

4         The parties dispute what happened next: Defendants allege that the Suspect got out of his
5   car and was moving to the back of his car when suddenly, and without any warning, the Suspect
6   reached behind his back and into his waistband as if to retrieve a weapon (SDF at ¶ 30), whereas
7   Plaintiff asserts that the Suspect exited the vehicle with his hands down by his side. (SDF at ¶
8   27.) Plaintiff also alleges that '[t]he suspect was wearing very thin gym shorts, and it was
9   obvious there was no weapon nor was there any threat made." (SDF at ¶ 30.) Defendants assert
10  that the suspect was ordered to surrender but ignored the commands. (SDF at ¶ 31.) Jenkins took
11  Eko out of the back passenger-side door of his patrol car, held him by his collar with his left hand,
12  and moved forward toward the front of his patrol car toward the Suspect. (SDF at ¶ 29.) Jenkins
13  gave Eko an apprehension command and released his collar. (SDF at ¶ 33.) Jenkins did not
14  announce that he was deploying Eko. (SDF at ¶ 35.) Defendants assert that Jenkins did not have
15  enough time to announce and Plaintiff disputes this fact. (SDF at ¶ 35.) Plaintiff disputes that
16  the Suspect ignored the officers' commands and asserts that the Suspect was standing and walked
17  around the car after the canine was released. (SDF at ¶ 31.)

18        Jenkins mistakenly thought that Eko was keyed on the Suspect. (SDF at ¶ 39.) However,
19  instead of going to the Suspect, Eko ran towards Harris. (SDF at ¶ 41.) When Jenkins realized
20  that Eko was distracted, he immediately attempted to recall Eko and ran after Eko. (SDF at ¶ 42.)
21  Eko ran past Harris and toward an open garage. (SDF at ¶ 43.) Just as Eko got near the open
22  garage, Jenkins caught a glimpse of a man walking into the garage. (SDF at ¶ 44.) Jenkins was
23  running toward Eko yelling the recall command, but unfortunately he was not able to recall Eko
24  before Eko bit the man on his calf. (SDF at ¶ 45.) Once Jenkins reached Eko, he gave Eko the
25  call-off command, grabbed Eko, and redirected Eko at the Suspect. (SDF at ¶ 46.) Plaintiff
26  asserts that Eko was unresponsive to any of Jenkins' verbal commands which is why Jenkins had
27  to physically grab the canine and physically redirect it to within a few feet of the suspect. (SDF
28  at ¶ 46.)

Defendants assert that Jenkins was not aware that anyone other than the Suspect and deputies were on scene until he saw Eko reach and bite the man. (SDF at ¶ 46.) Plaintiff asserts that Jenkins' assumption, that no civilians were present, was unreasonable since the incident happened on a Sunday morning in a residential neighborhood. (SDF at ¶ 48.) Once the Suspect was in custody, Jenkins let his supervisors, Patrol Sergeant Rogers and Canine Sergeant Cox, know what happened and called for paramedics to come to the scene to render medical aid. (SDF at ¶ 49.) The paramedics arrived within a few minutes after the Suspect was taken into custody, and they treated the innocent bystander identified as Plaintiff. (SDF at ¶ 50.)

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates no genuine issue as to any material fact exists, and therefore, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotations omitted). Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in

5

support of its contention that the dispute exists. Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 288–89. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587.

**III.   ANALYSIS**

Plaintiff's First Amended Complaint ("FAC") alleges four causes of action: excessive force against Jenkins; *Monell* liability against Defendants; battery against all Defendants; and negligence against all Defendants. (FAC, ECF No. 20.) Defendants have moved for summary

judgment on Plaintiff's First Cause of Action for excessive force against Jenkins and Second Cause of Action for *Monell* liability against County Defendants. (ECF No. 42.)

A. <u>Fourth Amendment Violation for Excessive Force</u>

Defendants' present only one argument as to why summary judgment is appropriate: That Plaintiff's excessive force claim fails because Plaintiff was not seized. (Mem. of P&A, ECF No. 42-1 at 6.) Defendants have provided this Court with case law supporting their proposition that a person cannot be seized for purposes of the Fourth Amendment if that person was not the intended object of the detention. (*See* ECF No. 42-1 at 6 (citing *Brower v. County of Inyo*, 489 U.S. 593 (1989).) However, in doing so, Defendants take solitary statements out of context and thus misinterpret the Supreme Court's holding. In *Brower*, the Supreme Court held that a decedent—who was killed when he crashed into a police roadblock while driving a stolen car and attempting to elude pursuing police —was not unreasonably seized. *Id.* The Supreme Court held:

> It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*.

*Id.* at 596–97 (emphasis in original). In fact in Justice Stevens' concurrence (which was joined by Justices Brennan, Marshall and Blackmun) he stated:

> The intentional acquisition of physical control of something is no doubt a characteristic of the typical seizure, but I am not entirely sure that it is an essential element of every seizure or that this formulation is particularly helpful in deciding close cases. The Court suggests that the test it articulates does not turn on the subjective intent of the officer. *Ante*, at 1382. This, of course, not only comports with the recent trend in our cases, *see, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 815–819, 102 S.Ct. 2727, 2736–2739, 73 L.Ed.2d 396 (1982); *United States v. Mendenhall*, 446 U.S. 544, 554, n.6, 100 S.Ct. 1870, 1877, n.6, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.), but also makes perfect sense.

*Id.* at 600. Moreover, the Ninth Circuit has extended the holding in *Brower* to a dog bite case with analogous facts to the instant matter:

> Although Mr. Rogers was not the actual suspect that the police

7

> officers sought, the police K–9's biting of Mr. Rogers constituted a seizure under the Fourth Amendment. *See Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) ("A seizure occurs even when an unintended person or thing is the object of the detention or taking ...") (citation omitted).

*Rogers v. City of Kennewick*, 304 F. App'x 599, 601 (9th Cir. 2008); *see also Garcia v. City of Sacramento*, No. No. 10–cv–00826–JAM–KJN, 2010 WL 3521954, at *2 (E.D. Cal. 2010) (though police-dog attacked the wrong person, officer's intentional use of the dog to search for and subdue a suspect was sufficient to find a seizure). The Court finds that the facts in this case fit squarely within the aforementioned case law. Even though Eko attacked the wrong person, Jenkins' intentional deployment of Eko to apprehend the Suspect would be sufficient to constitute a seizure. Therefore, Defendants' motion for summary judgment as to Plaintiff's First Cause of Action is denied.

### B. *Monell* Liability

Plaintiff alleges that using a canine and allowing it to bite bystanders under non-exigent circumstances is part of the unconstitutional policies and procedures of Defendant County of Sacramento. (Opp'n, ECF No. 52 at 5.) Plaintiff asserts that "K9s will attack whoever the canine has within its field of view, without discerning between a suspect, a fellow officer of the law, or an innocent bystander." (ECF No. 52 at 5.) Plaintiff asserts that the policy lacks restrictions and gives canine handler absolute discretion in deploying canines. Plaintiff concludes that the acts of the handler are in effect, the policy. (ECF No. 52 at 5.) Specifically, Plaintiff asserts that the policy wrongfully allows for the use of canine agents without the existence of exigent circumstances and further fails to train the dogs in environments that have distractions. (ECF No. 52 at 7.)

Defendants moves for summary judgment on Plaintiff's Second Cause of Action against County Defendants asserting that Plaintiff: (1) cannot establish *Monell* liability based on a single incident involving Eko; (2) cannot show that Sheriff Jones had actual knowledge that Plaintiff's constitutional rights were violated by Jenkins and/or that he approved of the violation of Plaintiff's constitutional rights by Jenkins; and (3) has failed to show a failure to train.[2] (ECF No.

---

[2] Defendants also assert that no Fourth Amendment violation occurred and thus that Plaintiff's *Monell* claim

8

42-1 at 10–11.)  The Court addresses each of these arguments in turn.

### i. Monell Framework

Under the Supreme Court's decision in *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 689–91 (1977), a government entity may be held liable under 42 U.S.C. § 1983, but such liability must be founded upon evidence that the government unit itself supported a violation of constitutional rights and not on the basis of the respondeat superior doctrine or vicarious liability.  A claim against a state or municipal official in his official capacity is treated as a claim against the entity itself.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  The Supreme Court has stated that an official capacity claim is simply "'another way of pleading an action against an entity of which an officer is an agent.'  As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Id.* at 165–66 (quoting *Monell*, 436 U.S. at 690 n.55).

Municipal liability only attaches when execution of a government's policy or custom inflicts the plaintiff's injury.  *See Monell*, 436 U.S. at 694; *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997).  A plaintiff may demonstrate a policy or custom of a municipality by showing one of the following:

> (1) 'a longstanding practice or custom which constitutes the standard operating procedure of the local government entity;'
>
> (2) 'that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;' or
>
> (3) 'that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.'

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (quoting *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002)).  The Ninth Circuit has held that a single incident will not suffice to show a policy.  *See Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999).

---

should be dismissed.  Because this Court has already determined that Plaintiff has alleged facts supporting a Fourth Amendment violation, the Court need not address this argument.

9

In *City of Canton v. Harris*, 489 U.S. 378, 379–80, 388 (1989), the Supreme Court held that deliberately indifferent training may give rise to § 1983 municipal liability. However, it limited liability to instances "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact," and that deliberate indifference was the moving force of the violation of the plaintiff's federally protected right. *Id.* at 388. Therefore, "only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389. To succeed the plaintiff must demonstrate specific training deficiencies and either (1) a pattern of constitutional violations of which policy-making officials can be charged with knowledge, or (2) that training is obviously necessary to avoid constitutional violations, e.g., training on the constitutional limits on a police officer's use of deadly force. *Id.* at 390–91.

### ii. Plaintiff's Allegations within the FAC

In the FAC, Plaintiff alleges that employees used excessive force against others in violation of the Fourth Amendment of the United States Constitution, and that in so doing, Defendants' employees acted pursuant to a longstanding "practice or custom." (ECF No. 20 at ¶ 37.) The FAC asserts that this practice or custom is established by "numerous verdicts and judgments." (ECF No. 20 at ¶ 37.) Plaintiff also asserts that in light of these adjudications of excessive force, County Defendants "have taken no affirmative actions to end excessive force by its employees. This inaction includes, but is not limited to, failure to (1) discipline, (2) retrain, (3) investigate, (4) re-investigate, and, (5) change the written use of force policies." (ECF No. 20 at ¶ 40.) Plaintiff further alleges that County Defendants "have a written use of force policy which is per se the cause of injury to Plaintiff, which includes the releasing of police dogs from vehicles without the necessity of a leash," (ECF No. 20 at ¶ 42), and that the release of such dogs is reckless (ECF No. 20 at ¶ 46), and is considered deadly force (ECF No. 20 at ¶ 45).

### iii. Sacramento County Sheriff's Department Policy

Defendants have supplied the Court with a copy of the policies governing canine agents. (*See* Exs. A–G, ECF No. 42-3.) The policy offers the following deployment guidelines for

canines:

> The decision whether or not to deploy a Sheriff's canine in any given situation shall remain with the handler. The handler alone is best qualified to determine whether their canine can be used in a given situation, and is most knowledgeable of their canine capabilities and limitations.
>
> . . .
>
> Deployment Guidelines
>
> A. Department canines may be used to locate and apprehend a suspect if the handler reasonably believes the individual has either committed or is about to commit any serious offense and if any of the following conditions exist:
>
> 1. There is a reasonable belief the individual poses an imminent threat of violence or serious harm to the public, the canine handler, or any officer.
>
> 2. The individual is physically resisting arrest and the use of a canine reasonably appears necessary to overcome such resistance.
>
> 3. The individual(s) is/are believed to be concealed in an area where entry by other than the canine would pose a threat to the safety of the officers or the public.
>
> 4. It is recognized situations may arise which do not fall within the provisions set forth in this policy.  In any such case, a standard of objective reasonableness shall be used to review the decision to use a canine in view of the totality of the circumstances.
>
> B. Absent the presence of one or more of the above conditions, mere flight from pursuing officer(s) shall not serve as good cause for the use of a canine to apprehend an individual.
>
> Considerations Prior to Deployment
>
> Prior to the use of a Department canine to search for or apprehend any individual, the canine handler and/or supervisor on scene shall carefully consider all pertinent information reasonably available at the time.  The information should include, but is not limited to the following:
>
> 1. The individual's age or an estimate thereof.
>
> 2. The nature of the suspected offense.
>
> 3. Any potential danger to the public and/or other officers at the scene if the canine is utilized.
>
> 4. The degree of resistance, if any, the individual has shown.
>
> 5. The potential for escape or flight if the canine is not utilized.

6. The potential for injury to officers or the public caused by the individual if the canine is not used.

Canine Search Announcement

A. Unless it would otherwise increase the risk of injury or escape, a clearly audible warning to announce a canine will be released if the person does not come forth, shall be made prior to releasing a canine. The canine handler, when practical, shall first advise the supervisor of his/her decision if a verbal warning is not given prior to releasing the canine. In the event of an apprehension where the subject was contacted by the canine, the handler shall document in any related report whether or not a verbal warning was given, and if none was given, the reasons why. When giving a canine warning the following considerations should be taken into account:

1. Provide the canine warning in a loud voice, or by use of amplified sound.

2. Announce the presence of the canine unit.

3. Order the subject out of hiding.

4. Warn the subject they may be injured by the canine.

5. Give the subject a reasonable amount of time to comply with the announcement before starting search.

6. Repeat warnings when appropriate.

7. Advise Communications after warnings have been given.

8. Advise Communications that the search has begun.

9. When feasible use the helicopter's or patrol vehicle's public address system to make announcements.

(Canine Enforcement Detail Deployment Guidelines, Ex. G, ECF No. 42-3 at 1–3.) The Sacramento County Sheriff's Department requires continual training for both their handlers and canine agents. For example:

B. Formal training sessions will be conducted on a weekly basis at a time and location designated by a Detail Supervisor. Each member of the Detail will be required to assist with training at the direction of a Detail Supervisor.

C. Detail Supervision will provide a monthly training calendar. The calendar will designate location and times of training and will be approved by the Detail Commander.

D. Daily training by each handler is expected and will be conducted during the course of the remaining workdays, as time allows. These

sessions shall be limited in scope and directed toward the specific maintenance training needs of each canine.

## IV. CERTIFICATION AND EVALUATION

A. Within each calendar year, every Canine shall be evaluated by a recognized P.O.S.T. Certified Evaluator as designated by a Detail Supervisor or Detail Commander.

B. As prescribed by the Basic P.O.S.T. Standards, the recertification process will require a 'pass' rating in each of the following categories:

1. Obedience
   a. Obedience
   b. Control of canine
2. Apprehension
   a. Control
   b. Pursuit.
   c. Contact
   d. Call off
3. Handler protection
   a. Physical contact with the aggressor
   b. Call off
   c. Control
4. Search
   a. Control
   b. Locate
   c. Recognition

C. Each Canine will also require a "pass" rating according to Sacramento Sheriff's Department standards in the following categories in order to recertify.

1. Tracking
   a. Control
   b. Locate
   c. Recognition
2. Article Search
   a. Control
   b. Locate
   c. Recognition

D. Periodic evaluations of each canine teams' abilities and performance will be conducted to ensure compliance with departmental standards.  These evaluations will take place at irregular intervals and shall be at the discretion of the Detail supervision.

E. Within each calendar year every canine team will additionally recertify its skills by entering two (2) Western States Police Canine Association trials.  Participation in WSPCA trials may be waived at the discretion of Detail Supervision based upon the demonstrated

proficiency of that canine team.

(Operations Order, Handler and Canine Training, Ex. F, ECF No. 42-3 at 2–3.)

     *iv.*  *A Single Incident*

  Defendants assert that Plaintiff's *Monell* claim fails because Plaintiff cannot establish *Monell* liability based on this single incident involving Eko. (ECF No. 42-1 at 11.) Plaintiff does not really address this issue in his opposition. Plaintiff spends most of his briefing arguing that a Fourth Amendment violation has occurred. This Court does not disagree with this statement. However, this does little to further Plaintiff's *Monell* claim. For instance, Plaintiff has attached numerous declarations from other cases, but Plaintiff's briefing is devoid of any arguments as to how or why these declarations support any of his allegations. Plaintiff's briefing also fails to provide any sort of statistical information that would support his assertion that the instant incident is representative of a commonly occurring issue and not a single incident. In fact, although Plaintiff has filed numerous submissions, Plaintiff does not cite to any of them in his briefing. Even assuming that Plaintiff intended this Court to take its numerous submissions as evidence of a custom or policy, the Court is not convinced. One of Plaintiff's submissions includes a 114 page document containing unintentional dog bite incident reports from 2008–2012. (*See* Ex. 13, ECF No. 45-4.) Plaintiff fails to mention this document in his briefing and thus offers no arguments as to whether these incidents show a pattern and if so, what facts would support such a pattern. This Court has combed through these reports, essentially performing work Plaintiff should have accomplished, and for the following reasons does not find that a clear pattern exits.

  At first glance, the report seems to include a number of incident reports. However, upon review, it is clear that the size of the report is due to the inclusion of duplicative copies of many of the individual reports. (*See* Ex. 13, ECF No. 45-4.) In sum, the report contains ten incidents over a four year span. Although the number of canine responses over this time frame has not been provided to this Court, it is safe to assume that canine teams respond to incidents fairly frequently. Thus, ten incidents over four years seem to be a pretty low incident percentage rate. Furthermore, these incidents do not involve similar fact patterns that would give rise to a specific

1  custom.  For example, one of the incidents involved a canine that was not on duty, but instead
2  playing fetch off leash with his handler in a park.  (*See* Ex. 13, ECF No. 45-4 at 58–74.)   In many
3  of the incidents, unlike the instant case, multiple police warnings were given to civilians in the
4  area to stay within their residences.  (*See* Ex. 13, ECF No. 45-4 at 3, 5, 43, 75.)  Another incident,
5  involved an officer that lost his footing and unintentionally released the canine agent.  (*See* Ex.
6  13, ECF No. 45-4 at 17.)   Similarly, Plaintiff also includes declarations from individuals
7  involved in another case, *Gangstee v. County of Sacramento*, Case No. 2:10-CV-01004-KJM-
8  GGH.  (*See* Exs. 15, 16, 17.)  In *Gangstee*, the canine agent was not intentionally deployed:
9  "According to LeCouve, Dantes [the canine agent] twisted out of his grip, injuring his finger; he
10 did not report or document the injury, which was minor.  LeCouve ran after Dantes."  *Gangstee v.*
11 *County of Sacramento*, Case No. 2:10-CV-01004-KJM-GGH, 2012 WL112650, at *2 (E.D. Cal.
12 January 12, 2012) (internal citations omitted).  The facts in *Gangstee* are not analogous to the
13 matter at hand.  In the instant case, Plaintiff is arguing that the County has a policy of using
14 excessive force by utilizing canine agents.  Therefore, an unintentional deployment of a canine
15 agent does not support the intentional use of canine agents to employ excessive force.   Plaintiff's
16 experience with Eko, as frightening as it must have been, does not support a finding of a custom
17 so persistent and widespread that it constitutes a permanent and well settled city policy.  *See*
18 *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be
19 predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient
20 duration, frequency and consistency that the conduct has become a traditional method of carrying
21 out policy.")  As such, the Court agrees that Plaintiff has not shown that an unconstitutional
22 policy exists in which officers utilize canine agents to employ excessive force.

23          Additionally, this Court notes that it appears from Plaintiff's opposition that he may be
24 asserting that the use of canine agents is inherently dangerous and thus unconstitutional.  Plaintiff
25 makes statements about the actions of the handlers "in fact being the policy" because they are
26 given "absolute discretion."  (ECF No. 52 at 5.)  However, Plaintiff has not presented any real
27 evidence in support of this argument.  In contrast, Defendants have provided the canine policy
28

that provides guidelines to canine handlers concerning deployment of the canines.[3] *See supra* Section III(B)(ii). The policy outlines the types of situations in which deployment is appropriate. *See supra* Section III(B)(iii). Although the policy does explicitly rely on the handlers' using their experience and discretion, it does not on its face give canine handlers free reign as Plaintiff suggests. Instead, it requires the handlers, like all officers in the field, to make split-second decisions based on the circumstances before them. Plaintiff has not provided this Court with evidence to support that this discretion is being regularly abused, let alone with a sufficient frequency and consistency to be considered a custom or policy. Thus, the Court does not find that Plaintiff's single unfortunate experience creates a policy separate from the County's written policy, nor does the Court find that the County's policy is per se unconstitutional.

> v.   *Knowledge of Constitutional Violations and Ratification*

Defendants assert that Plaintiff's ratification theory of *Monell* liability fails because Plaintiff cannot show that County Defendants ratified constitutional violations. (ECF No. 42-1 at 10.) Specifically, Defendants assert that Plaintiff's claim rests on his allegations that the Sheriff refused to find Jenkins culpable for policy violations in this case and that "it is well-settled that a policymaker's refusal to overrule a subordinate's completed act does not constitute approval."

---

[3] The policy also outlines the characteristics that the Sheriff Department considers in choosing its handlers:

HANDLER SELECTION

A. Knowledge: Deputies selected as Canine Handlers shall have demonstrated during a selection process that they have knowledge suitable for the requirements of the position.

B. Experience: It is essential that a deputy selected to be a Canine Handler shall have served a period of time in a patrol assignment to develop the experience and confidence needed to function independently and with initiative.

C. Maturity & Leadership: The selection panel for Canine Handlers will consider the candidate's background in their search for these qualifications.

D. Candidates for Canine Handler must have a residence that provides a secure outdoor area for the canine and a reasonable response time for call outs.

E. Newly assigned Canine Handlers must successfully complete the Department's Entry Level Canine Course. Upon completion of the course and assignment to field duties, the handler must successfully pass a probation period of six months. During the training course and probationary period assessment records shall be routinely prepared by the Detail supervisors.

(Canine Handler Operations Order, Ex. C, ECF No. 42-3 at 2.)

(ECF No. 42-1 at 10.) This Court agrees.

First, as discussed above, Plaintiff has not shown that there is in fact an unconstitutional policy. Furthermore, although a municipality also can be liable for an isolated constitutional violation if the final policymaker "ratified" a subordinate's actions, to show ratification, a plaintiff must prove that the "authorized policymakers approve a subordinate's decision" and the basis for it. *Christie v. Iopa*, 176 F.3d 1231, 1238–39 (9th Cir. 1999). "It is well-settled that a policymaker's mere refusal to overrule a subordinate's completed act does not constitute approval." *Id.* at 1239; *see also Weisbuch v. County of Los Angeles*, 119 F.3d 778, 781 (9th Cir. 1997) ("To hold cities liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle respondeat superior liability into section 1983.") (citation and internal quotation marks omitted); *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) (stating the same principle). Plaintiff has not provided this Court any evidence that would support his *Monell* claim under this theory. In fact, Plaintiff's opposition is completely silent on this issue. As such, the Court finds that Plaintiff cannot support his *Monell* claim under a theory of ratification.

### vi. Failure to Train

Lastly, Defendants argue that Plaintiff's *Monell* liability claim cannot succeed because Plaintiff has failed to show a failure to train: "A failure to train theory requires proof that 'in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need to train its employees.'" (ECF No. 42-1 at 10 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).) Although not clearly articulated in his briefing, Plaintiff makes a passing argument there is a known deficiency in the training, specifically that the canines are not trained with distractions that they will face in the field. In fact, Plaintiff's complete argument on the matter consists of the following sentence:

> No training with distractions: the canine is easily distracted by other officers and bystanders; the canine is easily distracted by movement of other officers and bystanders; the canines are unresponsive to out

>  commands in real life situations; the training does not involve real life scenarios of bystanders; Impossible to train the dog to attack a specific person when a bystander is present.

(ECF No. 52 at 7.)  Plaintiff offers no citations, factual or legal, to support these claims.

To impose liability on the County for deficiencies in its policies or procedures, or for a failure to adequately train its employees, the County's omissions must amount to "deliberate indifference" to a constitutional right.  *City of Canton*, 489 U.S. at 388; *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010).  To succeed the plaintiff must demonstrate specific training deficiencies and either (1) that policy-making officials were aware of a pattern of constitutional violations, or (2) that training is obviously necessary to avoid constitutional violations, e.g., training on the constitutional limits on a police officer's use of deadly force.  *City of Canton*, 489 U.S. at 390–91.  The failure must be the result of "a 'deliberate' or 'conscious' choice by a municipality."  *Id.* at 389.  Neither negligent nor even grossly negligent training by itself gives rise to a § 1983 municipal liability claim.  *Id.* at 391–92 ("In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident. . . Thus, permitting cases against cities for their 'failure to train' employees to go forward under § 1983 on a lesser standard of fault would result in de facto respondeat superior liability on municipalities—a result we rejected in *Monell*.").

It is clear that County Defendants have a policy that includes regular training for canine handlers and their canine companions.  Furthermore, there is no evidence of a pattern of prior constitutional violations that may have resulted from inadequate training.  Plaintiff has failed to provide evidence to establish that the County Defendants knew of a need to train and/or supervise in a particular area and then made a deliberate choice not to take any action.  Therefore, Plaintiff is unable to sustain a claim under a failure to train theory.

**IV.   CONCLUSION**

For the foregoing reasons, the Court hereby GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment (ECF No. 42.)  Defendant's motion for summary judgment as to Count I for Excessive Force under 42 U.S.C. § 1983 against Defendant Jenkins is

DENIED.  Defendant's motion for summary judgment as to Count II for *Monell* liability under 42 U.S.C. § 1983 against Defendants Sacramento County, County of Sacramento Sheriff's Department, and Sheriff Scott Jones in his official capacity  is GRANTED.

     IT IS SO ORDERED.

Dated: January 22, 2016

                                              Troy L. Nunley
                                              United States District Judge